IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ELIZABETH L. MAGUIGAN,                )
                                      )
                Plaintiff,            )
                                      )
        v.                            )        Civil Action No. 08-924-GMS
                                      )
MICHAEL J. ASTRUE,                    )
Commissioner of Social Security,      )
                                      )
                Defendant.            )
_____)

## MEMORANDUM

### I.      INTRODUCTION

On December 8, 2008, the plaintiff, Elizabeth L. Maguigan ("Maguigan"), filed this appeal from the Administrative Law Judge ("ALJ") decision denying her disability benefits under the Social Security Act. (D.I. 1.)  Presently before the court are the parties' cross-motions for summary judgment. (D.I. 16; D.I. 19.)  For the reasons that follow, the court will: (1) deny the plaintiff's motion for summary judgment; and (2) grant the defendant's motion for summary judgment.

### II.     BACKGROUND

On February 23, 2006, Maguigan filed applications for Title II Disability Insurance Benefits and Title XVI Supplemental Security Income. (D.I. 11 at 99-111.)  Both applications alleged disability beginning June 5, 2005. (Id. at 99, 104.)  Following the Social Security Administration's (the "SSA") denial of her claim, both initially and upon reconsideration, Maguigan requested an ALJ hearing. (Id. at 70, 79.)  Pursuant to that request, an ALJ hearing was held on March 20, 2008. (Id. at 30-60.)  At this hearing, testimony was given by Maguigan and an impartial vocational expert ("VE"), Tony Melanson ("Melanson"). (Id.)  On April 9,

2008, the ALJ, Melvin D. Benitz, issued a written decision denying Maguigan's benefits claim. (Id. at 10-25.)  The ALJ concluded Maguigan "is not disabled under sections 216(I) and 223(d) of the Social Security Act."  (Id. at 25.)  Subsequently, the Appeals Council denied a request for review.  (Id. at 3-7.)  On December 8, 2008, Maguigan filed an appeal in this court.  (D.I. 1).

### A.    Medical Evidence

1.    *Diabetes*

On November 24, 2004, Maguigan began treatment for diabetes with Deborah Zarek, M.D. ("Zarek").  (D.I. 22 at 588.)  Zarek is her primary care physician.  (Id.)

On March 21, 2005, Maguigan was admitted to Christiana Hospital after an episode of vomiting.  (D.I. 11 at 205.)  According to those records, she had "uncontrolled diabetes and [a] mild case of diabetic ketoacidosis."  (Id. at 229.)  She improved after receiving insulin.  (Id. at 232.)

It was documented on November 7, 2005 that Maguigan had lower extremity circulation problems of mild to moderate bilateral arterial occlusive disease.  (D.I. 12 at 411.)  An angiogram showed narrowing of the femoral artery, which resulted in a stent being placed.  (Id. at 300.)  After that procedure, she denied further leg pain.  (Id. at 301.)  On January 24, 2006, her medical records note that she had improved right leg circulation, a normal right lower extremity ABI study,[1] and mild left extremity arterial occlusive disease.  (Id. at 398.)  Further, on March 7, 2006, normal bilateral ABI findings were documented.  (Id. at 354.)

---

[1] ABI study is an ankle-brachial index for diagnosing peripheral arterial disease ("PAD").

2

On May 1, 2006, Maguigan was admitted to Christiana Hospital with a right toe ulcer. (Id. at 474.)  On May 26, 2006, a PICC line[2] was placed for the non-healing wound. (D.I. 22 at 519.)  On June 8, 2006, Zarek noted the ulcer was "healing well." (Id. at 566.)  On November 2, 2006, Maguigan was evaluated for a second toe ulcer, proximal to the original ulcer. (Id. at 657.) On February 2, 2007, she underwent a fusion of the first and second phalanges of the right great toe. (Id. at 601.)  A PICC line was placed for intravenous antibiotics; however, on April 10, 2007, she was admitted to Christiana Hospital for a non-healing toe wound. (Id. at 601, 599.)  A MRA[3] of her right foot showed osteomyelitis; consequently, she underwent debridement and resection surgery. (Id. at 599.)  On May 10, 2007, the ulcerative area around her toe was noted as completely healed. (Id. at 622.)

Because of her diabetes, periodic blood sugar ("BS") studies were performed.  On May 11, 2005, Zarek noted Maguigan's BS was 341 and increased her insulin. (Id. at 579.)  On May 1, 2006, her BS was noted as remaining elevated (over 300). (D.I. 12 at 477.)  On May 3, 2006, her BS was 65 and she had two episodes of hypoglycemia.  (Id. at 498.)  Zarek noted that Maguigan was better after she received insulin.  (D.I. 22 at 569.)   Richard Plotzker, M.D. ("Plotzker"), an endocrinologist that treated Maguigan's diabetes, explained the episodes as resulting from improper hypoglycemia precautions.  (Id. at 666.)  On June 5, 2006, Maguigan's BS was again over 300 (id. at 543), and on October 16, 2007, Zarek noted uncontrolled BS levels (id. at 670).

---

[2] PICC line is a peripherally inserted central catheter, which is a form of intravenous access for extended antibiotic therapy.
[3] MRA is a magnetic resonance angiogram, which generates images of blood vessels in the body.

Maguigan's non-compliance with treatment of her diabetes was problematic. On January 12, 2005, she admitted to not regularly checking BS levels and not taking her prescribed medication, Neurontin. (Id. at 585.) On March 21, 2005, she admitted not taking Avandamet and other prescribed medications. (D.I. 11 at 227.) On April 2, 2005, she confirmed not taking her diabetes medication correctly (D.I. 22 at 583), and again acknowledged being non-compliant in this regard on May 1, 2006 (D.I. 12 at 487). Additionally, on March 7, 2008, Zarek recorded continued difficulties by Maguigan with compliance. (D.I. 22 at 668.)

Further, multiple notations are made throughout the record regarding thirty-five years of tobacco abuse. (D.I. 11 at 227, 231; D.I. 12 at 296; D.I. 22 at 564, 661.) Also, continued smoking was documented even after the link between diabetes, poor healing, and limb loss was communicated to Maguigan. (D.I. 12 at 299; D.I. 22 at 570, 648.)

2.   *Right Shoulder Pain*

On January 18, 2005, Maguigan's history of right shoulder pain and limited range of motion was noted: subsequently, an MRI[4] was taken. (D.I. 11 at 198.) The MRI showed tendinitis. (Id. at 199.) Some physical therapy was completed, with no reports of pain noted in the discharge request. (Id. at 200.) On March 22, 2005, Zarek reported that a steroid injection resolved Maguigan's shoulder pain. (Id. at 232.) On November 11, 2005, an ENMG[5] of Maguigan's right upper extremity was performed. (D.I. 12 at 267.) The ENMG showed mildly prolonged distal latencies consistent with carpal tunnel syndrome. (Id.)

After further complaints of pain, Maguigan was diagnosed with impingement syndrome on February 10, 2006. (Id. at 311, 379.) An arthroscopic acromioplasty and debridement were

---

[4] MRI is magnetic resonance imaging, which provides a detailed visualization of the internal structure of the body.
[5] ENMG is electroneuromyography, which uses an electric current to stimulate muscle nerves.

performed.  (Id. at 311, 346.)  On February 13, 2006, Maguigan reported reduced pain.  (Id. at 374.)  On March 6, 2006, the medical record reflects that she was able to move her shoulder better after surgery.  (D.I. 22 at 567.)  During a follow-up visit, findings indicated that Maguigan had only a slight decrease in internal rotation, excellent active and passive ranges of motion, and no pain medication was requested.  (D.I. 12 at 360.)  Further, on March 22, 2006, improvement with full range of motion was recorded.  (Id. at 359.)  Nevertheless, additional complaints of a sore right shoulder occurred on June 8, 2006 and September 15, 2006.  (D.I. 22 at 566, 675.)

3.    *Fibromyalgia*

On November 24, 2004, Zarek diagnosed that Maguigan may suffer from fibromyalgia.  (Id. at 588.)  During an office visit on September 21, 2007, however, Zarek could not confirm whether Maguigan had fibromyalgia or peripheral neuropathy.    (Id. at 671.)    Peripheral neuropathy is a condition caused by or related to diabetes.

On multiple occasions, Maguigan complained of leg pain and numbness.  (D.I. 12 at 296; D.I. 22 at 568, 622.)  She also complained of difficulty walking.  (D.I. 11 at 228.)  On January 26, 2006, Zarek noted the leg pain was likely caused by peripheral neuropathy.  (D.I. 22 at 568.)  On August 21, 2006, the medical record indicates that Neurontin failed to provide complete relief and physical therapy made the pain worse.  (Id. at 666.)  Plotzker noted the loss of sharp, vibrating, and monofilament sensation in Maguigan's feet.  (Id. at 667.)  Nevertheless, as early as November 3, 2006, Lyrica was reported as helping.  (Id. at 665.)  On multiple occasions, the medical record reflects that Lyrica helped with pain, neuropathy, paresthesias, and produced symptomatic improvements.  (Id. at 661, 665, 670, 674.)

5

4.    *Other Medical Conditions*

Frequent notations were made in the medical record regarding Maguigan's obesity. (D.I. 12 at 296; D.I. 22 at 603, 647.)   Throughout her treatment, Maguigan's blood pressure and hypertension remained controlled, despite her intermittent compliance with taking her blood pressure medication. (D.I. 11 at 232; D.I. 12 at 356; D.I. 22 at 566, 568, 570, 573, 575, 666, 672, 674.)

**B.    Hearing Testimony**

1.    *Elizabeth L. Maguigan's Testimony*

At the March 20, 2008 hearing before the ALJ, Maguigan testified about her background, the nature of her claim for disability benefits, and the course and extent of her medical treatment. (D.I. 11 at 30-53).   Specifically, she testified about her diabetes, fibromyalgia, and shoulder problems. (Id. at 38-50.)

In describing her diabetes, Maguigan testified that she is treated by Zarek and Plotzker. (Id. at 38, 42.) She explained that Zarek initially prescribed insulin, which helped. (Id. at 38.) She stated that Plotzker regulates her insulin levels and the insulin injections help control her BS. (Id. at 43.) She admitted that her BS is "running fair" and Plotzker adjusts her insulin levels as needed.   (Id.)   Maguigan explained that she initially had stomach problems; however, such problems resolved when she was put on insulin. (Id. at 52.)   She also testified about constant leg pain. (Id. at 38.)   She explained that medication makes the pain "livable," but does not eliminate it completely. (Id. at 39.)   She noted her pain medication, Vicodin, causes drowsiness. (Id. at 50.)   Also, Maguigan stated that she had ulcers on her feet, which required surgery. (Id. at 39.) The first procedure was successful and the ulcer healed; however, the second ulcer became

infected, causing a delay in healing and the foot to remain swollen. (Id. at 39-40.) Her foot continues to bother her due to a fracture of unknown origin which "healed broken." (Id.)

In describing her shoulder problems, Maguigan testified that she had a shoulder operation in which the socket was "cleaned out." (Id. at 41.) Although that surgery was successful, she is still tender and sore. (Id. at 42.) She noted that fibromyalgia shoulder pain is similar, but different, and the procedure improved mobility of her arm. (Id.)

Maguigan testified that Zarek diagnosed her with fibromyalgia. (Id. at 41.) As a result of the fibromyalgia, her legs and shoulders hurt, and her shoulders are weak. (Id.) She confirmed that medication helps her symptoms and ensures she is not "crying with pain." (Id. at 42.)

In describing her current and former jobs, Maguigan testified she has done various types of security work including dispatching, security control, and alarm checking. (Id. at 37.) She stated when her "legs got worse" she sat behind a desk and stopped performing building rounds. (Id.) She explained that she works part time, sixteen hours a week and occasional overtime, in a security position. (Id.) She testified that if she works three days in a row, she becomes tired, hurts, and stays in bed the following day. (Id. at 37, 49.)

In describing her daily activities, Maguigan testified that she drives her roommate to and from work, and occasionally to the store. (Id. at 36.) She explained she still does chores occasionally, including the dishes and quick cooking. (Id. at 47.) She testified that she visits her mother once or twice a week. (Id. at 48.) She claimed she is unable to cook for long periods or vacuum. (Id. at 47-48.) She explained that due to balance problems she sits down to dress. (Id. at 48.) She testified she uses a cane based on her own initiative and not pursuant to medical advice. (Id. at 40-41.) Further, she claimed the cane is used for balance, and admitted that she has never fallen. (Id. at 41.)

7

In describing her limitations, Maguigan stated she has problems walking, standing, sitting, and lifting. (Id. at 43-47, 50.) She complained she can walk approximately half-a-block and requires a motorized cart to do grocery shopping. (Id. at 43, 50.) She stated walking causes her legs to become sore from the knees down, and this pain is not helped by medication. (Id. at 44.) She explained she can stand for approximately ten minutes before changing position. (Id.) She testified that due to upper leg pain she can sit for approximately one-half-hour, and longer if in a comfortable chair. (Id. at 46.) She explained she cannot lift over a gallon of milk, and despite hand tightening, she can use her hands. (Id. at 46-47.) Further, she noted her pain can affect her concentration. (Id. at 44.)

2.    *Vocational Expert's Testimony*

Melanson, the VE, offered testimony regarding Maguigan's background, skills, limitations, and the number of jobs existing in the national economy for a person of her age, education, and skills. (Id. at 53-59.)

Melanson testified that Maguigan's past work as a security guard is classified as light and semiskilled, with a Specific Vocational Preparation ("SVP") of three. (Id. at 53.) He explained Maguigan's past work as a security dispatcher is classified as sedentary and semiskilled, with an SVP of four. (Id.) He stated Maguigan's past work as a sedentary security guard, a type of monitoring position, is classified as sedentary and unskilled. (Id.) He noted the skills associated with such work are not transferable to other fields. (Id.)

According to Melanson, the hypothetical person described by the ALJ, with Maguigan's Residual Functional Capacity ("RFC"), could be employed to undertake sedentary and light work positions. (Id. at 55.) Under the sedentary category, he claimed there is a security monitor position. (Id.) Under the light work category, positions include gate guard and cashier. (Id.)

8

Melanson noted that Maguigan's RFC includes a sit/stand limitation that "the DOT[6] does not address." (Id. at 56.) However, he clarified that "testimony regarding a sit/stand option is based on my knowledge." (Id.) He testified that based on Maguigan's past work, she could only undertake the security monitor position. (Id.) He admitted a hypothetical person with the limitations described in Zarek's RFC would be unfit to perform any of the noted jobs. (Id. at 57.) Additionally, he admitted that the use of a cane would limit the light work positions; absences once a week would limit all positions; and unscheduled breaks would limit all positions if productivity was reduced by twenty-percent. (Id. at 58.)

## C.   The ALJ's Findings

To determine whether an individual is disabled, the following five step sequential analysis is required:

> [The Commissioner] determines first whether an individual is currently engaged in substantial gainful activity. If that individual is engaged in substantial gainful activity, he will be found not disabled regardless of the medical findings. 20 C.F.R. § 404.1520(b). If an individual is found not to be engaged in substantial gainful activity, the [Commissioner] will determine whether the medical evidence indicates that the claimant suffers from a severe impairment. 20 C.F.R. § 404.1520(c). If the [Commissioner] determines that the claimant suffers from a severe impairment, the [Commissioner] will next determine whether the impairment meets or equals a list of impairments in Appendix I of sub-part P of Regulations No. 4 of the Code of Regulations. 20 C.F.R. § 404.1520(d). If the individual meets or equals the list of impairments, the claimant will be found disabled. If he does not, the [Commissioner] must determine if the individual is capable of performing his past relevant work considering his severe impairment. 20 C.F.R. § 404.1520(e). If the [Commissioner] determines that the individual is not capable of performing his past relevant work, then he must determine whether, considering the claimant's age, education, past work experience and residual functional capacity, he is capable of performing other work which exists in the national economy. 20 C.F.R. § 404.1520(f).

---

[6] DOT is Dictionary of Occupational Titles, which includes occupational definitions and is used by the SSA to evaluate job requirements.

*West. v. Astrue*, No. 07-158, 2009 WL 2611224, at *5 (D. Del. Aug. 26, 2009) (citing *Brewster*

*v. Heckler*, 786 F.2d 581, 583–84 (3d Cir. 1986)).  Based on the factual evidence and testimony,

the ALJ determined Maguigan was not disabled; therefore, she was not entitled to disability

insurance benefits.  (D.I. 11 at 25.)  The ALJ's findings are summarized as follows:

> 1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.
> 2.  The claimant has not engaged in substantial gainful activity since June 5, 2005, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*). . . .
> 3.  The claimant has the following severe impairments: diabetes mellitus, right shoulder pain status post rotator cuff surgery, and fibromyalgia (20 CFR 404.1520(c) and 416.920(c)). . . .
> 4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1526, 416.920(d), 416.925 and 416.926). . . .
> 5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she could only lift 20 pounds occasionally, 10 pounds frequently, sit for 20 minutes, stand for 10 minutes, continuously on an alternate basis during an eight hour day, five days a week, moderately limited to push and pull and with no prolonged climbing, balancing, and stooping, and only occasional reaching, handling and fingering and limited to jobs where extreme temperature and humidity, height, and hazardous machinery could be avoided. . . .
> 6.  The claimant is able to perform any past relevant work (20 CFR 404.1565 and 416.965). . . .
> 7.  The claimant was born on May 23, 1957 and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).
> 8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).
> 9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).
> 10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966). . . .

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 5, 2005 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Id.)

## III. STANDARD OF REVIEW

### A. Motion for Summary Judgment

Both parties filed motions for summary judgment pursuant to Fed. R. Civ. P. 56(c). (D.I. 16; D.I. 19.) In determining the appropriateness of summary judgment, a court must review the record as a whole and "draw all reasonable inferences in favor of the nonmoving party, [but] may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted). If a court determines that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," summary judgment is appropriate. *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting Fed. R. Civ. P. 56(c)).

### B. Review of the ALJ's Findings

A court must uphold factual decisions if they are supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence is not a "large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 564-65 (1988) (citation omitted). Substantial evidence is further defined as "more than a mere scintilla." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Credibility determinations are, likewise, the province of the ALJ, and should be disturbed on review only if they are not supported by substantial evidence. *See Pysher v. Apfel*, No. 00-1309, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schweiker*, 717 F.2d 871,

11

973 (3d Cir. 1983)).   Thus, the inquiry is not whether this court would make the same determination; but, whether the ALJ's conclusion is reasonable.   In social security cases, this substantial evidence standard applies to motions for summary judgment brought pursuant to Fed. R. Civ. P. 56(c).   *See Woody v. Sec'y of the Dep't of Health & Human Serv.*, 859 F.2d 1156, 1159 (3d Cir. 1988).

## IV.   DISCUSSION

After considering the record in this case, the parties' submissions and arguments, and the applicable law, the court concludes that the ALJ's decision is supported by substantial evidence. Specifically, the court finds that the ALJ was reasonable in his apportionment of weight to the medical opinion evidence, evaluation of obesity, and analysis of pain.   Therefore, the court will: (1) deny the plaintiff's motion for summary judgment; and (2) grant the defendant's motion for summary judgment.

### A.   Treating Physician's Medical Opinion

An examining doctor's written report setting forth medical findings in the doctor's area of competence "may constitute substantial evidence."   *Richardson*, 402 U.S. at 402.   In determining the proper weight to give to such medical opinions, the ALJ is required to weigh all evidence and resolve any material conflicts.   *See id.* at 399.   Regarding such weight, the Third Circuit stated that "treating physicians' reports should be accorded great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'"   *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Rocco v. Heckler*, 826 F.2d 348, 350 (3d Cir. 1987)).   A treating physician's opinion is "entitled to substantial and at times even controlling weight."   *Fargnoli v. Halter*, 247 F.3d 34, 42 (3d Cir. 2001).   It is accorded "controlling weight" if it is "well-supported by medically

12

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." *Id.* (quoting 20 C.F.R. § 404.1527(d)(2)).

The ALJ, however, may reject a treating physician's opinion if it is based on "contradictory medical evidence." *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000) (citation omitted). In those instances, "[e]ven where there is contradictory medical evidence, . . . and an ALJ decides not to give a treating physician's opinion controlling weight, the ALJ must still carefully evaluate how much weight to give the treating physician's opinion." *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 660 (D. Del. 2008). Further, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927." Social Security Regulation ("S.S.R.") 96-2p, 1996 WL 374188, at *4 (July 2, 1996).

It is improper for an ALJ to disregard a treating physician's medical opinion based solely on one's own impression of the record and evaluation of a claimant's credibility. *See Morales*, 225 F.3d at 318 ("The ALJ cannot . . . disregard [a treating physician's] medical opinion based solely on his own 'amorphous impressions, gleaned from the record and from his evaluation of [the claimant]'s credibility.'") (citation omitted). Additionally, some explanation must be given "for a rejection of probative evidence which would suggest a contrary disposition." *Brewster*, 786 F.2d at 585. It can be appropriate to accept some evidence and reject the rest; however, all evidence must be considered and a reason for rejection must be provided. *See Stewart v. Sec'y of H.E.W.*, 714 F.2d 287, 290 (3d Cir. 1983).

Here, the court finds that the weight apportioned by the ALJ to Zarek's opinion is based on substantial evidence in the record. In assigning "some weight" to her opinion, the ALJ found certain findings consistent with the record. (D.I. 11 at 23.) Those include: (1) the need to sit and

stand; (2) the lack of a need to use a cane; (3) limitations in handling, fingering and reaching; and (4) the need to avoid extreme conditions and temperatures. (Id.) Nevertheless, the ALJ found Zarek's other conclusions inconsistent with the record, her treatment records, and her medical expertise. (Id.) Specifically, the ALJ rejected Zarek's opinions regarding: (1) interference with concentration due to pain; (2) time limitations on sitting, standing, and walking; and (3) the need for frequent unscheduled breaks. (D.I. 22 at 590-91.) Thus, the ALJ gave little weight to Zarek's opinion that Maguigan is incapable of working in low stress jobs. (Id.)

The court disagrees with Maguigan's claim that the ALJ erred when he did not afford Zarek's opinion with controlling weight. (D.I. 17 at 12.) Zarek's opinion is entitled to controlling weight if supported by medical evidence and consistent with the record. In light of conflicting medical and other evidence, the ALJ was entitled to reject some of the findings contained in Zarek's RFC.

First, Zarek's opinion is inconsistent with medical evidence which documented the success of treatment and pain reduction. Medical evidence from other treating doctors indicates: (1) the normalization of her ABI bilaterally; (2) the success of Lyrica in causing symptomatic improvements; (3) reduced shoulder pain and full range of motion; and (4) the control of her hypertension with medication. (D.I. 12 at 354, 356, 359, 374; D.I. 22 at 661, 665-66.)

Second, Zarek's opinion is inconsistent with her own treatment history. Throughout her treatment notes, Zarek indicated that: (1) insulin kept Maguigan's diabetes under control; (2) Lyrica was helpful for pain; (3) ABI improved when a stent was placed; (4) toe ulcers healed; and (5) surgery relieved shoulder pain and increased mobility. (D.I. 11 at 232; D.I. 22 at 566-69, 670, 674.) Further, on June 21, 2006, Zarek approved Maguigan's request to return to work at

14

limited duty. (D.I. 22 at 565.) Yet, on August 1, 2006, Zarek, in answering the RFC questionnaire, listed limitations that would render Maguigan incapable of doing the job for which she was approved by Zarek. (Id. at 589-92.) During that forty day interim, no significant medical change occurred. Rather, on July 7, 2006, Zarek noted that Maguigan's ulcer had healed and her shoulder was better after surgery. (Id. at 565.) Although Zarek recorded Maguigan's complaints of pain, she additionally noted Maguigan's non-compliance with medications. (Id.) Zarek's opinions are entitled to deference; however, those involving the determination of disability and inability to work are not. Decisions regarding disability are for the Commissioner to determine in light of credibility determinations and other issues such as non-compliance.

Third, Zarek's opinion is also inconsistent with Maguigan's daily activities. In addition to working part-time, which Zarek authorized, Maguigan testified that she drives, does some chores, and visits her mother. (D.I. 11 at 36-37, 47-48.) Such level of daily activity is inconsistent with a person incapable of tolerating low stress jobs. As a result, the ALJ's allocation of less weight to Zarek's opinion is supported by substantial evidence.

Further, in assigning less weight to part of Zarek's findings, the ALJ is required to consider all evidence and provide an appropriate explanation. Here, the ALJ evaluated the record, including complaints of pain, before concluding that Zarek's opinion was inconsistent. (Id. at 22.) In assigning less weight, the ALJ noted multiple reasons: (1) inconsistency; (2) lack of vocational expertise; (3) lack of expertise in neurology or rheumatology; and (4) significant reliance on Maguigan's subjective complaints. Therefore, the ALJ satisfied his burden of conducting a thorough evaluation and providing appropriate explanations.

## B. Evaluation of Maguigan's Obesity

Step two requires an evaluation of whether a claimant has an impairment, or combination of impairments, that is "severe." 20 C.F.R. § 404.1520(a)(4)(ii). An impairment, or combination of impairments, is severe "only if it significantly limits the claimant's physical or mental ability to do 'basic work activities.'" *Salles v. Comm'r of Soc. Sec.*, 229 Fed. Appx. 140, 144 (3d Cir. 2007) (citing 20 C.F.R. § 404.1521).

Regarding obesity, instruction is given for adjudicators "to consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity." *Rivera v. Comm'r of Soc. Sec.*, No. 08-3254, 2009 WL 840586, at *2 (3d Cir. 2009) (quoting S.S.R. 02-1P, 2000 WL 628049, at *1 (Sept. 12, 2002)). Additionally, one should "consider 'the combined effects of obesity with other impairments' when making disability determinations." *Id.* Nevertheless, once the ALJ determines obesity is not relevant, he is not required to repeat the analysis at every additional step. *See id.* (citing *Rutherford v. Barnhart*, 399 F.3d 546, 552-53 (3d Cir. 2005)).

Here, the court finds that the ALJ's treatment of obesity is supported by substantial evidence in the record. The ALJ concluded that although Maguigan was diagnosed as obese, "[t]he medical record does not support the alleged severity of . . . obesity." (D.I. 11 at 18.) Further, the ALJ noted that obesity was considered in assessing impairments under each evaluation step. (Id.) Through this process, the ALJ concluded that there was not enough evidence to show that obesity had "more than a minimal effect on . . . [the] ability to perform basic work activities." (Id. at 19.)

16

First, the court disagrees with Maguigan's contention that the ALJ erred in relying on the opinions of Vinod Kataria, M.D. ("Kataria")[7] and Robert Keisman, M.D. ("Keisman").[8]  (D.I. 17 at 17.)  Maguigan alleges the opinions of Kataria and Keisman to be faulty because both fail to consider her obesity.  (Id.)  Although the word "obesity" was not present in their respective reports, no claim was made that Kataria and Keisman did not have access to a complete medical record.  (D.I. 12 at 505-12; D.I. 22 at 562-63.)  Accordingly, the allegation that the opinions "failed to even consider . . . obesity" is unfounded.

Second, the court disagrees with Maguigan's claim that the ALJ erred in finding obesity was not a severe impairment.  (D.I. 17 at 17.)  While the record includes multiple passing referencing Maguigan's obesity, it fails to show that her obesity "significantly limits [her] physical or mental ability to do 'basic work activities'" and, therefore, does not establish the causal relationship required for a finding of severe impairment.  (D.I. 12 at 296; D.I. 22 at 603, 647); *Salles*, 229 Fed. Appx. at 144.    Rather, no indication is given that Maguigan's obesity exacerbates particular symptoms or affects her ability to work.  Consequently, the ALJ's non-severe impairment finding is reasonable.

Third, the court disagrees with Maguigan's claim that the ALJ failed to consider the effect of obesity on other impairments.  (D.I. 17 at 19.)  The ALJ noted the presence of obesity and considered the cumulative effects it had on other impairments.   (D.I. 11 at 18-19.) Nevertheless, as stated above, no causal link was indicated in the record.  Despite the lack of such evidence, the ALJ included obesity in the hypothetical question posed to the VE.  (Id. at

---

[7] Kataria is a state agency medical consultant who prepared a RFC for Maguigan on May 25, 2006.  (D.I. 12 at 505-09; D.I. 22 at 510-12.)

[8] Keisman is a state agency medical consultant who prepared a Case Analysis for Maguigan on June 19, 2006.  (D.I. 22 at 562-63.)

54.)  As a result, the court rejects Maguigan's assertion that the ALJ failed to consider obesity and finds that the ALJ's treatment of obesity is based on substantial evidence in the record.

### C.    Evaluation of Maguigan's Symptoms and Non-compliance

In evaluating symptoms, the ALJ must "consider all . . . symptoms, including pain."  20 C.F.R. § 404.1529(a).  Also, the ALJ must consider whether such symptoms "can reasonably be accepted as consistent with the objective medical evidence and other evidence."  *Smith v. Astrue*, No. 08-4634, 2009 WL 5126559, at *3 (3d Cir. 2009) (quoting 20 C.F.R. § 404.1529(a)).  Once it is determined that an impairment "could reasonably be expected to produce . . . symptoms, such as pain," the "intensity and persistence" must be evaluated to determine the effect on the ability to work.  20 C.F.R. § 404.1529(c).  Under this evaluation, a variety of factors are considered including, but not limited to: (1) "objective medical evidence;" (2) "daily activities;" (3) "location, duration, frequency, and intensity;" (4) medication prescribed, including its effectiveness and side effects; (5) treatment; and (6) other measures to relieve pain.  *Id.*

Here, the court finds the ALJ's treatment of Maguigan's pain is reasonable.  First, the ALJ concluded Maguigan's "medically determinable impairments could reasonably be expected to produce the alleged symptoms."  (D.I. 11 at 21.)  The ALJ determined that the "statements . . . concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent they are inconsistent with the residual functional capacity assessment."  (Id.)  In addressing Maguigan's credibility, the ALJ evaluated the record as a whole.  (Id. at 21-23.)

The court disagrees with Maguigan's allegation that the ALJ failed to consider non-exertional limitations.  (D.I. 17 at 25.)  The court acknowledges that Maguigan complains of pain and fatigue throughout the record.  Thus, the ALJ included moderate pain and fatigue in the hypothetical question asked of the VE.  (D.I. 11 at 54.)  Nevertheless, multiple contradictions

exist in the record, which provide substantial evidence in support of the ALJ's evaluation of symptom severity.

First, the purported severity of symptoms is inconsistent with Maguigan's daily activities. As discussed herein, Maguigan testified that she currently works part time in a security position. (Id. at 37.) She also testified that she drives frequently, does chores occasionally, and visits her mother at least once a week. (Id. at 36, 47-48.) Although she testified about multiple limitations in her daily activities, the extent of her abilities contradict the contentions of debilitating pain and inability to work.

Second, the alleged symptom severity is inconsistent with the success of treatment. Regarding her diabetes, Maguigan testified that insulin helps, her BS is "running fair," and medication makes pain "livable." (Id. at 38-39, 43.) Medical evidence reveals that a stent helped reduce extremity pain, circulation improved, and both toe ulcers healed. (D.I. 12 at 301, 398; D.I. 22 at 566.) Regarding shoulder pain, Maguigan testified that surgery was successful and she is able to move her arm. (D.I. 11 at 42.) Medical evidence reveals full range of motion was achieved. (D.I. 12 at 359.) Regarding fibromyalgia, Maguigan testified that medication helps her symptoms. (D.I. 11 at 42.) Medical evidence shows that Lyrica helped with pain and caused symptomatic improvements. (D.I. 22 at 661, 665, 670, 674.) Regarding other medical conditions, the medical evidence proves that her hypertension and blood pressure are well controlled. (D.I. 11 at 232; D.I. 12 at 356; D.I. 22 at 566, 570, 666.) As a result, significant evidence in the record reveals that her impairments are under control and susceptible to treatment.

Third, the alleged symptom severity is further complicated by Maguigan's persistent non-compliance. In order to obtain benefits, a claimant "must follow treatment prescribed by . . . [a]

physician if . . . treatment can restore . . . ability to work." 20 C.F.R. § 404.1530. Thus, an individual is not disabled if an impairment is controlled by medication. *See Salles*, 229 Fed. Appx. at 145. As noted herein, the record shows a history of failure to check BS and failure to take prescribed medication that alleviated her symptoms. (D.I. 11 at 227; D.I. 12 at 487; D.I. 22 at 568, 573, 575, 583, 585, 668, 672, 674.) The record also demonstrates a history of tobacco abuse despite contrary recommendations from medical professionals. (D.I. 11 at 227, 231; D.I. 12 at 296, 299; D.I. 22 at 564, 570, 648, 661.) The court agrees with the Commissioner that Maguigan's failure to follow treatment undermines her credibility and cannot serve as a basis for disability. (D.I. 20 at 17.) Consequently, based on daily activities, the success of treatment, and Maguigan's non-compliance, the ALJ's evaluation of her symptoms is supported by substantial evidence in the record.

## D.     Determination of RFC and Evaluation of Limitations

In making a RFC determination, all evidence must be considered. *See Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted). Further, although the ALJ can make credibility determinations, a reason must be provided for rejecting specific evidence. *Id.* (citations omitted).

Here, the ALJ determined that Maguigan's RFC authorized light work with specific limitations for lifting, sitting, standing, pushing, pulling, climbing, balancing, stooping, reaching, handling, fingering, and exposure to certain extreme conditions and temperatures. (D.I. 11 at 19.) In reaching this conclusion, the ALJ noted that medical evidence and opinion testimony were considered. (Id.)

First, as stated above, a thorough evaluation was conducted regarding medical opinions, severity of obesity, symptom evaluation, and treatment non-compliance. Conducting his

20

evaluation, the ALJ provided explanations for rejecting non-credible evidence. In view of the ALJ' thorough evaluation, the RFC is based on substantial evidence in the record.

Second, contrary to Maguigan's argument, the RFC contains no internal conflicts. (D.I. 17 at 23.) The RFC reveals a restricted version of light work. As such, the ALJ noted that Maguigan's limitations would not allow her to perform all the requirements of every light work position. (D.I. 11 at 24.) Therefore, in determining job availability, the ALJ relied on the VE's expertise and testimony addressing the existence of such light work jobs in the national economy. (Id.)

Third, the court rejects Maguigan's claim that she is disabled based on Medical-Vocational Guideline 201.14. (D.I. 17 at 25.) That guideline, addressing sedentary work, is inapplicable because the RFC determination for light work is reasonable. Therefore, Maguigan's claim that the limitations to the light work RFC constituted a sedentary RFC is invalid, especially in light of the VE's testimony regarding appropriate light work jobs.

### E.     Vocational Expert Testimony of Available Work

Hypothetical questions asked to the VE need only reflect the impairments supported by the record. *See McDonald v. Astrue*, No. 07-4493, 2008 WL 4368226, at *3 (3d Cir. 2008). Consequently, when a hypothetical is accurate, the VE's response constitutes substantial evidence. *See id.* (citing *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987)). Therefore, a VE's testimony is only valid if based on a hypothetical question that accurately reflects a claimant's physical and mental limitations. *See Myers v. Comm'r of Soc. Sec.*, No. 08-2906, 2009 WL 2445129, at *1 (3d Cir. 2009) (citing *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir.1984)). Additionally, at step five, "the burden of production shifts to the Commissioner, who

must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability." *Plummer*, 186 F.3d at 428. (citing 20 C.F.R. § 404.1520(f)).

Here, the ALJ's hypothetical question to the VE included Maguigan's RFC, age, education, and work experience. (D.I. 11 at 53-54.) In response, the VE noted available jobs in the light work and sedentary categories. (Id. at 54-55.) Since the DOT does not address a sit/stand option, one of Maguigan's RFC limitations, the VE included this option in his analysis. (Id. at 24.)

The court rejects Maguigan's claim that the burden of showing available work was not met because the hypothetical question was improper. (D.I. 17 at 26.) Maguigan argues that the question failed to consider pain, fatigue, and obesity. (Id. at 26-27.) Yet, the question directly mentioned that the hypothetical person "suffers from obesity" and has "moderate pain and . . . fatigue." (D.I. 11 at 54.) As stated above, the ALJ's evaluation of Maguigan's obesity and symptom severity is supported by substantial evidence in the record; therefore, the hypothetical question was valid. Accordingly, the VE's testimony constitutes substantial evidence.

## V.   CONCLUSION

For the forgoing reasons, this court will: (1) deny the plaintiff's motion for summary judgment; and (2) grant the defendant's motion for summary judgment.

August __5__, 2010

CHIEF UNITED STATES DISTRICT JUDGE

22

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ELIZABETH L. MAGUIGAN,           )
                                 )
            Plaintiff,           )
                                 )
        vi.                      )      Civil Action No. 08-924-GMS
                                 )
MICHAEL J. ASTRUE,               )
Commissioner of Social Security, )
                                 )
            Defendant.           )
_____)

## **ORDER**

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1.  The plaintiff's motion for summary judgment (D.I. 16) is DENIED.

2.  The defendant's motion for summary judgment (D.I. 19) is GRANTED.

Dated: August  5 , 2010

CHIEF, UNITED STATES DISTRICT JUDGE